UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
STEVEN B. THOMAS,

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**
CV 12-4343 (AYS)

Plaintiff,

-against-

JOHN WELLENREUTHER,

Defendant.
-----------------------------------------------------X

**APPEARANCES:**

PAUL WEISS RIFKIND WHARTON & GARRISON
1285 Avenue of the Americas
New York, New York 10017

BY: ERIC ALAN STONE, ESQ.
    DANIEL H. LEVI, ESQ.
    ROBERT JOSEPH O'LOUGHLIN, III, ESQ.
    JESSICA FUHRMAN, ESQ.
    NINA M. KOVALENKO, ESQ.
Attorneys for Plaintiff

JARED A KASSCHAU, ESQ., NASSAU COUNTY ATTORNEY
BY: RALPH J. REISSMAN, ESQ. ASSISTANT COUNTY ATTORNEY
1 West Street
Mineola, New York 11501
Attorneys for Defendant

**SHIELDS, Magistrate Judge,**

       On or about August 17, 2012, Plaintiff Steven B. Thomas ("Plaintiff" or "Thomas") com-

menced this action pursuant to 42 U.S.C. §1983 ("Section 1983") against the Nassau County Po-

lice Department and Nassau County Police Officer John Wellenreuther ("Wellenreuther"). When

the action was commenced Thomas appeared <u>pro se</u>. <u>See</u> Docket Entry ("DE") [1]. On May 29,

1

2019, after the parties engaged in discovery, the District Court decided to appoint pro bono counsel for purposes of trial. DE [87]. On October 29, 2019, the law firm of Paul, Weiss, Rifkind, Wharton and Garrison agreed to accept the District Court's appointment, and a trial before the District Judge was scheduled. In December of 2019, counsel agreed to consent to the jurisdiction of this Court for all purposes pursuant to 28 U.S.C. § 636(c). DE [103].

On March 3, 2020, pro bono counsel filed an amended complaint naming only Wellenreuther as a defendant and alleging clearly the factual basis for Plaintiff's Section 1983 complaint. In summary, the amended complaint asserts the unconstitutional use of excessive deadly force during an incident that occurred on October 5, 2011. On that day, Plaintiff was shot twice by Defendant, who was off duty and not in uniform. The amended pleading details the facts of the incident forming the basis of Plaintiff's claim, as well as his damages. See DE [115].

A jury trial was scheduled for March of 2020. The trial was adjourned on several occasions due to the COVID-19 pandemic. Thereafter, the parties agreed to a bench trial, which this Court held on March 16, 2021. On that date, all counsel and Defendant appeared at the trial in person. Plaintiff testified remotely. Post-trial briefing was completed on April 9, 2021.

As discussed in further detail below, both Thomas and Wellenreuther testified credibly. Each did their best to relate facts surrounding an incident that took place more than ten years prior to trial. When they could not remember something with complete clarity, they said so. The Court accepts the version of the facts set forth below. Those facts are based upon the parties' testimony, documents before the Court, and the fact that, in certain critical aspects, Thomas's version of the events simply makes more sense. Upon consideration of the trial testimony and documents, the parties' submissions and all proceedings herein, this constitutes the Court's Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

I.    <u>The Parties and the Events of October 5, 2011</u>

1. Thomas is an individual who was born in Queens, New York and is currently 34 years old. Transcript of Trial ("Tr.") at 8.

2. On October 5, 2011, Wellenreuther was a police officer with the Nassau County Police Department. Tr. 61-62. He is currently a sergeant. Tr. 104.

3. Prior to the events forming the basis of this action, Wellenreuther had been a police officer for approximately three and one-half years. Tr. 61.

4. On October 5, 2011 at approximately 7:00 A.M. Thomas was inside a convenience store located on the premises of a service station in Elmont, New York known as the Liberty Gas Mart (the "Gas Station"). Tr. 10.

5. A 2012 photograph of the Gas Station taken from "Google Maps" (the "Gas Station Photograph") was introduced at trial. Thomas identified, and there was no real argument to the contrary, that the Gas Station Photograph accurately portrayed the layout of the Gas Station, the gas pumps, and the convenience store as of October 5, 2011. Tr. 12.

6. The Gas Station was located at the intersection of Hempstead Turnpike and Stone Street. Tr. 62. Hempstead Turnpike is a commercial avenue and Stone Street is a residential block. Tr. 63.

7. In addition to the Gas Station Photograph, Thomas identified a 2012 Google Maps photograph of Stone Street (the "Stone Street Photograph"). As the testimony below makes clear, Stone Street is the block toward which Thomas proceeded upon exiting the Gas Station. Thomas testified, (and there was no real argument to the contrary), that with the

3

exception of unimportant details such as the type of fencing and landscaping, the Stone Street Photograph fairly depicted Stone Street, and its relation to Hempstead Turnpike, as of October 5, 2011. Tr. 23.

8. At the same time that Thomas was inside the convenience store at the Gas Station, Wellenreuther had just finished working a twelve-hour shift, which he completed at 7:00 A.M. Tr. 62; 105.

9. Although off-duty, Wellenreuther, permissibly, carried his service revolver on the morning of October 5, 2011. Tr. 106.

10. After completing his shift Wellenreuther went to the Gas Station. Tr. 62.

11. At the time, Wellenreuther was driving his personal vehicle, a black pickup truck which was not (and could not reasonably have been) mistaken for a police vehicle. Tr. 62-63.

12. Thomas described Wellenreuther's clothing on the date of the incident as jeans, sneakers and a "regular jacket." Tr. 17.

13. Wellenreuther described the clothing he wore on the date of the incident as dark blue uniform pants and a flannel shirt. Tr. 63-64.

14. However described, it is clear that on the morning of October 5, 2011, Wellenreuther was not dressed in clothes that could identify him as a police officer.

15. Upon his arrival at the Gas Station, Wellenreuther went inside the convenience store to pay the attendant with cash for gas. Tr. 106. He then exited the store and started to pump his gas. Tr. 106.

16. Thomas was inside the convenience store located at the Gas Station when Wellenreuther arrived at the Gas Station.

17. At the time, Thomas had a toy gun in the pocket of his sweatshirt. Tr. 45. That toy gun was characterized at trial as a "BB gun."

18. While Wellenreuther testified that it was his belief that Thomas was carrying a gun, it is clear that the weapon Thomas was carrying on the day of the incident was a BB gun. Tr. 87-88.

19. When Wellenreuther was pumping gas, there was a gas pump between him and the convenience store, which blocked any clear view that Wellenreuther might have had into the convenience store. Tr. 66.

20. While Wellenreuther was pumping gas, an individual (not Thomas) exited the convenience store, got into a taxicab and drove away. Tr. 66-67; 107.

21. Wellenreuther made no effort to look inside the convenience store until the taxicab drove away. Tr. 67.

22. After the taxicab drove away, Wellenreuther looked inside the convenience store and saw someone at the counter wearing a hoodie-type sweatshirt. Tr. 68.

23. The person observed by Wellenreuther had his arm at a right angle, pointing at the attendant. Tr. 107. However, Wellenreuther could not see what, if anything, the person was holding in his hand. Tr. 68. This was because Wellenreuther's view was obscured by a window display. Tr. 69; 107.

24. Thomas was the person who Wellenreuther observed at the convenience store counter pointing at the attendant. Tr. 70.

25. While observing Thomas inside the convenience store, Wellenreuther did not observe any act of violence taking place therein. Tr. 70.

26. As he exited the convenience store, Thomas was walking fast, but was not running. Tr. 71.

27. After Thomas exited the convenience store, the attendant exited. The attendant was excited, but not injured. Tr. 70.

28. Wellenreuther observed Thomas exit the convenience store. Tr. 70; 107.

29. Wellenreuther testified that he saw money hanging out of Thomas's sweatshirt pocket. Tr. 107.

30. Wellenreuther made no attempt to stop Thomas as Thomas made his immediate exit from the convenience store. Tr. 71.

31. Wellenreuther watched Thomas exit the store and continued to observe him, because he thought that Thomas looked a "little weird." Tr. 108. Wellenreuther heard the convenience store attendant, who did not testify at trial, yell that he was robbed and saw that person pointing at Thomas. Tr. 108.

32. Wellenreuther testified that he yelled for Thomas to stop, and that he identified himself as a police officer. Tr. 108.

33. Wellenreuther did not call for any backup. Tr. 71.

34. Although Wellenreuther was not on duty he was, as noted, in possession of his service weapon. Tr 71-72.

35. Wellenreuther agreed, and the Court finds, that after firing a weapon such as Wellenreuther's service weapon, any shell casings falling from that weapon would fall somewhere nearby to the site where the weapon was discharged. Tr. 72.

36. Thomas exited the convenience store and proceeded to his right, eastward toward a vacuum station. Tr. 14; 51-52; 70.

37. Wellenreuther drew his service weapon as Thomas exited the Gas Station. Tr. 71-72

38. Wellenreuther testified that Thomas "spun around" toward him, which put Wellenreuther in fear for his life and those around him. He therefore fired one round at Thomas. Tr. 73-74; 108. (the "First Gunshot").

39. When he fired the First Gunshot Wellenreuther could reasonably have believed that Thomas had a real gun; not a BB gun.

40. When he was in the convenience store at the Gas Station, and upon exiting, Thomas was carrying a BB gun in the right-hand pocket of his sweatshirt. Tr. 11.

41. As he was exiting the Gas Station and proceeding toward Stone Street, Thomas heard loud voices behind him. He testified, credibly, that although there was only one voice that he heard, there was a loud commotion. Tr. 15.

42. Upon hearing this commotion, Thomas turned to look over his shoulder and saw a man holding a gun pointed in his direction. Tr. 15. At trial, Thomas identified Wellentreuther as the man who was yelling and pointing a gun at him. Tr. 16. That man was Wellenreuther, who was not wearing a police uniform. Tr. 17; Tr. 63-64.

43. According to Thomas, Wellenreuther did not identify himself as a police officer. Tr. 17; 47-48.

44. Thomas denied that Wellenreuther was yelling at Thomas to stop. Tr. 48-50; 52.

45. When Thomas heard Wellenreuther shouting at him, Wellenreuther was close to the gas pumps, located across front the entrance to the convenience store, and was headed toward Stone Street. Tr. 19.

46. In reaction to Wellenreuther's shouting, and while looking over his shoulder Thomas saw Wellenreuther point a gun at him. Tr. 51.

47. At the same time, Thomas saw fire from a gun being shot in his direction. Tr. 20. This was the First Gunshot.

48. Wellenreuther fired the First Gunshot at Thomas before Thomas got fully around to face Wellenreuther. Tr. 74.

49. The First Gunshot did not hit Thomas. Tr. 52; 74.

50. The Court finds, based upon the consistent testimony of Thomas and Wellenreuther, that after the First Gunshot was fired, Thomas dropped to the ground to avoid being hit. Tr. 21; 51-52; 76; 109.

51. After dropping to the ground, Thomas got up and began to run down Stone Street, away from Wellenreuther. Tr. 76; 109.

52. When he first dropped to the ground, Thomas still had the BB gun in the pocket of his sweatshirt. Tr. 21.

53. After dropping to the ground to avoid the First Gunshot, Thomas stood up, pulled the BB gun out of his pocket, and threw it on to Stone Street. Tr. 22; 109. Thomas stated that he discarded the BB gun in this manner because it was weighing him down as he attempted to run from the shooter. Tr. 22-23; 48; 51.

54. After the First Gunshot missed Thomas, Wellenreuther saw what he believed to be a gun being transferred from Thomas's right hand. He also saw Thomas throw that weapon away from him. Tr. 76-77.

55. When Thomas threw the BB gun out of his pocket, it landed on a car parked on Stone Street. While Thomas could not say precisely where the BB gun landed, he knew that it hit a car, because he heard it make contact. Tr. 24.

56. Like Thomas, Wellenreuther testified that after the First Gunshot, Thomas threw the BB gun (which Wellenreuther thought was a real gun) away from him. Tr. 81-82, 92; 109.

57. Both Thomas and Wellenreuther heard the sound made by the BB gun as it was discarded and hit a parked car. Tr. 24; 109.

58. The Court finds, based upon the consistent and credible testimony of Thomas and Wellenreuther, that after the First Gunshot missed him, Thomas threw his weapon away from him, and that the weapon landed, out of Thomas's reach, on a parked car. Tr. 77-78; 82; 109.

59. Wellenreuther knew that after the First Gunshot missed him, Thomas discarded the weapon that was in his sweatshirt pocket.

60. After throwing the BB gun away, Thomas continued to run in the direction of the driveway of a house located on Stone Street. He jumped over a driveway fence at the house located on Stone Street, next to the Gas Station. Tr. 25; 76; 109

61. After the First Gunshot missed Thomas, Wellenreuther knew that whatever weapon Thomas had was thrown away from Thomas and was not in Thomas's possession. Wellenreuther knew that this weapon, whatever it was, was on the street- abandoned by Thomas. Tr. 82-83; 93.

62. After discarding his weapon, Thomas attempted to flee Wellenreuther. At that point in time, Wellenreuther knew that Thomas was unarmed. Tr. 83.

63. Wellenreuther continued to pursue Thomas as Thomas proceeded to jump over the driveway fence. Tr. 84.

64. As he continued to run, Thomas heard footsteps, breathing and yelling from the person who had shot him, and was continuing to run after him. Tr. 25-26.

65. After jumping the driveway fence, Thomas felt a burning sensation on the back of his neck and fell on to the concrete driveway. Tr. 26; 52.

66. The burning sensation was the result of Wellenreuther shooting a second time at Thomas (the "Second Gunshot").

67. The Second Gunshot hit Thomas in the back of his neck. Tr. 28.

68. Wellenreuther shot the Second Gunshot when Thomas was running away from him. Tr. 109.

69. Wellenreuther shot the Second Gunshot after he knew that Thomas had discarded the weapon that was in the pocket of his sweatshirt.

70. At the time that he was hit by the Second Gunshot, Thomas had his back to Stone Street and was running away from the sound of Wellenreuther's voice. Tr. 28.

71. Thomas did not hear Wellenreuther ever identify himself as a police officer. Tr. 28.

72. After being shot, Thomas fell forward to the ground. Tr. 29; 52.

73. When Thomas came to his senses after falling to the ground, after being hit by the Second Gunshot, he saw Wellenreuther running back towards the Gas Station. Tr. 29.

74. Because he saw the shooter (Wellenreuther) run towards the Gas Station, Thomas felt safe. Despite being shot in the back of his neck, Thomas was able to get to his feet and to begin to run towards his car, which was parked near the Gas Station. Tr. 30.

75. Wellenreuther testified that after the First Gunshot missed Thomas, he saw Thomas reach into his waistband. According to Wellenreuther, this took place after he saw Thomas throw away his weapon, and after he saw that weapon land on a parked car. Tr. 89; 96.

76. At the time that Wellenreuther stated that he saw Thomas reach into his waistband, Wellenreuther was approximately twenty feet away from Thomas. Tr. 89. At that time, Wellenreuther knew that Thomas had already discarded the weapon that Wellenreuther believed to have been a real gun. Tr. 89-90.

77. Wellenreuther never saw any weapon on Thomas's possession other than the discarded BB gun. Tr. 92; 96.

78. As far was Wellenreuther knew, Thomas had no second weapon. Tr. 96.

79. Following the shooting, a use of deadly force investigation report was prepared by the Nassau County Police Department. While that report states that Wellenreuther yelled to Thomas to "stop," it does not say that Wellenreuther yelled "stop" and also used the word "police." Wellenreuther agreed that if he had yelled "police," that fact would have been included in the report, but it was not. Tr. 95-96.

80. Wellenreuther testified on direct examination that prior to the First Gunshot he identified himself as a police officer. However, he could not clearly remember, after cross-examination, whether he did, in fact, so identify himself to Thomas. Tr. 94; 109.

81. Wellenreuther did not identify himself as a police officer prior to discharging the Second Gunshot.

82. Wellenreuther testified that prior to shooting his weapon for the second time he was in fear for his life, because Thomas again spun around at him. Tr. 110.

83. Thomas denied reaching into his sweatshirt pocket for any weapon. Tr. 21-22.

84. Thomas denied ever having a weapon in the waistband of his pants, and further denied ever reaching into his waistband for any weapon. Tr. 21; 28.

85. Thomas denied ever pointing any weapon at Wellenreuther. Tr. 22.

86. While the Court finds that, generally, Wellenreuther was a credible witness, the Court rejects as incredible and belied by the facts of this case, that Thomas was reaching into his waistband for a weapon when Wellenreuther discharged the Second Gunshot. The Court also finds a complete absence of any facts supporting any notion that on the October 5, 2011, Thomas was in possession of two weapons - real or otherwise. Nor could Wellenreuther have reasonably believed that Thomas was reaching for or facing him with a gun at the time when Wellenreuther fired the Second Gunshot. Tr. 93.

87. Wellenreuther agreed that if the Second Gunshot hit Thomas in the back of the neck Thomas could not have possibly been facing Wellenreuther when he shot at Thomas for the second time. Tr. 90-91.

88. The Court finds incredible Wellenreuther's testimony that Thomas was facing him when he was hit by the Second Gunshot - which hit Thomas in the back of his neck.

89. When Wellenreuther shot the Second Gunshot, he may have believed that Thomas had just robbed the convenience store. The facts indicate that while Thomas may have been robbing the convenience store, he injured no one.

90. While Wellenreuther may have reasonably believed that Thomas had robbed the convenience store, there are not facts to show that Thomas had injured anyone in the convenience store or at the Gas Station. Tr. 93.

91. At the time when Wellenreuther shot the Second Gunshot, Thomas was running away from him and was unarmed.

92. From Thomas's point of view, he was being shot at and chased by an armed individual who he did not know to be a police officer.

II.    <u>Thomas's Hospitalization and Testimony as to His Injuries</u>

93. Thomas did not introduce any medical records at trial. Nor did he introduce the testimony of any medical experts. Instead, trial testimony as to Thomas's damages consisted of his description of his pain and injuries. Despite the lack of expert testimony, the Court finds that Thomas testified credibly as to his injuries.

94. Thomas described the immediate pain he felt upon being shot as a sharp burning pain, which was accompanied by blood dripping down his back. Tr. 29.

95. After being shot, Thomas was transported by ambulance to a nearby hospital where he received medical treatment. Tr. 31; 53.

96. Upon arriving at the hospital, Thomas's clothes were cut away and blood was cleaned from his legs and back. Tr. 31.

97. After bandaging his neck wound, medical professionals "popped" Thomas's shoulder back into place. It was Thomas's understanding that this procedure was necessary to correct a dislocation that occurred when, after being hit by the Second Gunshot, Thomas fell forward to the ground, with his shoulder bearing the brunt of his weight. Tr. 31.

98. In addition to treatment for the gunshot wound to his neck and his dislocated shoulder, Thomas was treated at the hospital for scrapes and bruises to his knees and elbow. Tr. 32.

99. Treatment for the gunshot wound to Thomas's neck did not require any surgery. Tr. 58-59.

100.    Thomas suffers from hemophilia. It is Thomas's understanding that hemophilia is a disease that interferes with the ability of his blood to properly clot. <u>See</u> Tr. 32.

101.    As a result of his hemophilia Thomas receives treatments to allow his blood to clot. Tr. 32. Thomas referred to these treatments as administration of a clotting factor.

102.     Thomas's medical treatment following the shooting was complicated by the fact that he suffers from hemophilia. Tr. 32.

103.     Thomas testified that because of his hemophilia he could not stop bleeding after being shot. As a result, it was necessary for him to receive around the clock clotting factor, approximately every six to eight hours, which was administered intravenously. Tr. 32-33. This treatment contrasts with Thomas's usual hemophilia treatment which he undergoes approximately twice a week. Tr. 39.

104.     Thomas testified that his current twice weekly hemophilia treatments are less than the number of treatments that he received while hospitalized, but more than would have been necessary had he not been shot. He referred to this increase in treatment as a complication of having received a gunshot wound. Tr. 39.

105.     The Court finds credible Thomas's testimony regarding the frequency of hemophilia treatments during his hospitalization, and that such frequency was a more than Thomas normally received. However, the absence of expert medical testimony makes it impossible for the Court to evaluate whether Thomas's current treatments are more frequent or painful than those that would normally be received by a person with hemophilia. Nor can the Court make any finding that Thomas's current clotting factor regimen is complicated as a result of a gunshot wound suffered ten years prior to trial.

106.     The absence of medical records or expert testimony makes it impossible for the Court to make any finding as to whether the bullet made a clean entry into and exit from Thomas's neck.

107.     Thomas remained in the hospital for five or six days following the shooting. Tr. 32.

108.     After his release from the hospital, Thomas remained in pain and had a sling around his arm. Tr. 33.

109.     After his release from the hospital, Thomas experienced neck pain. He continues to experience such pain in the form of stiffness and discomfort at times when he moves his arm. Tr. 34.

110.     Thomas has a scar on the back of his neck which he displayed to the Court at trial. Tr. 34.

111.     The scar is approximately the size of a quarter and is visible on the back of Thomas's neck, on the right side. Tr. 35.

112.     In addition to physical injuries to his neck, shoulder and body, Thomas testified credibly about his mental condition following the shooting. Tr. 35.

113.     After his release from the hospital Thomas fell into a deep depression which he described as being "secluded" and going into his own "shell." Tr. 35.

114.     Thomas also had trouble sleeping and was fearful of being around people and law enforcement. Tr. 35.

115.     Thomas experienced nightmares, bad dreams and woke up in cold sweats. Tr. 35-36.

116.     Thomas also had headaches. Tr. 36.

117.     Thomas's sleeping difficulties persisted for between nine months to a year after the shooting. Tr. 36. Even after that period, Thomas still continues to experience periodic sleeping difficulties. Tr. 36.

118.     Thomas testified that following the shooting he was diagnosed as suffering from PTSD (post-traumatic stress disorder), depression and anxiety. Tr. 37.

119.     Thomas continues to experience bouts of depression and states that it has been difficult for him to move forward. Tr. 36-37.

120.     Thomas was under the care of a psychologist and a psychiatrist for two years following the shooting. Tr. 37-38. While he could not state precisely the names of particular medications or particular time frames of administration, Thomas testified that during this two-year period he was prescribed medication to treat his post-shooting mental state. Tr. 38.

<u>CONCLUSIONS OF LAW</u>

I.     <u>The Fourth Amendment Claim of Excessive Force</u>

     A.    <u>Legal Standard</u>

1. The Fourth Amendment to the United States Constitution protects against unreasonable search and seizure. U.S. Const. amend. IV.

2. Wellenreuther's gunshots constitute seizures under the Fourth Amendment. <u>See</u> <u>Torres v. Madrid</u>, 141 S. Ct. 989, 993-94 (2021).

3. Law enforcement officers may use only the amount of force that is "objectively reasonable" in order to effectuate a seizure. Use of an objectively unreasonable amount of force violates the Fourth Amendment and is therefore unconstitutional. <u>Graham v. Connor</u>, 490 U.S. 386, 397, 109 S. Ct. 1865, 1872, 104 L. Ed. 2d 443 (1989); <u>Tennessee v. Garner</u>, 471 U.S. 1, 7, 105 S. Ct. 1694, 1699, 85 L. Ed. 2d 1 (1985); <u>O'Bert v. Vargo</u>, 331 F.3d 29, 36 (2d Cir. 2003).

4. To determine whether force used is reasonable the Court considers the perspective of a reasonable officer based upon the facts and circumstances facing them when force is used. <u>Graham</u>, 490 U.S. at 396-97.

5. An officer's "good intentions are immaterial and will not justify an objectively unreasonable use of force." <u>Dancy v. McGinley</u>, 843 F.3d 93, 117 (2d Cir. 2016).

6. When assessing the reasonableness of the use of force the Court considers all facts facing the officer, including the severity of the crime alleged to have been committed, the behavior of the subject who is the object of the force, alternatives available to the officer, the danger to the officer, and the danger to others who may be nearby. <u>See</u> <u>Graham</u>, 490

U.S. at 396, <u>Collado v. City of New York</u>, 2017 WL 4533772, at *2 (S.D.N.Y. Sept. 27, 2017).

7.  The mere fact that an officer may objectively believe that a felony has been committed is not, standing alone, sufficient to justify the use of deadly force. It is "constitutionally unreasonable" to use deadly force to prevent the escape of all individuals fleeing the suspected commission of a felony. <u>Garner</u>, 471 U.S. at 11.

8.  Where feasible, an officer must give warning before using deadly force. <u>Garner</u>, 471 U.S. at 11-12.

9.  The constitutionality of the use of deadly force depends upon whether the suspect presents a threat to the officer or others - not on whether the suspect has committed a crime. <u>Garner</u>, 471 U.S. at 11.

10. The law is clear: the use of deadly force to prevent escape is reasonable only if the officer "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." <u>Garner</u>, 471 U.S. at 11. The use of "deadly force is objectively reasonable only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others,' " <u>Cowan</u>, 352 F.3d at 762 (quoting <u>O'Bert</u>, 331 F.3d at 36).

B.      Wellenreuther Violated The Fourth Amendment

11. There is no doubt that Wellenreuther used deadly force twice on October 5, 2011 in the form of the First Gunshot and the Second Gunshot.

12. Although the question is close, the Court holds that the use of deadly force in the form of the First Gunshot did not violate the Fourth Amendment.

13. It is clear, under the facts and circumstances here that the use of deadly force against Thomas, in the form of the Second Gunshot, violated the Fourth Amendment.

14. In reaching these legal conclusions the Court has considered and weighed the factual circumstances presented at trial, which presented a mostly consistent view of the facts and circumstances facing Wellenreuther when deadly force was used.

15. From the perspective of a reasonable police officer, based upon the facts as found by the Court above, the use of deadly force at the time of the First Gunshot was objectively reasonable, and therefore did not violate the Constitution.

16. The use of deadly force at the time of the First Gunshot was reasonable under the circumstances because at the time of that shooting, a reasonable police office could have believed that Thomas was fleeing from commission of an armed robbery. It was not reasonable to believe that any act of violence had occurred at the convenience store. However, at the time, it was reasonable to believe that there was a threat of violence and that Thomas had a weapon. When Thomas spun around, a reasonable police officer, believing Thomas to be in possession of a gun, could have used deadly force. Accordingly, Wellenreuther did not violate the Fourth Amendment when he used deadly force against Thomas at the time of the First Gunshot.

17. From the perspective of a reasonable police officer, based upon the facts and circumstances as found by the Court above, the use of deadly force at the time of the Second Gunshot was objectively unreasonable and therefore violated the Constitution.

18. While a reasonable police office could have believed that Thomas was fleeing from commission of an armed robbery, no reasonable police officer could have believed that Thomas was armed at the time of the Second Gunshot. As both Wellenreuther and

Thomas testified, Thomas threw his weapon away from him prior to the Second Gunshot. Both Thomas and Wellenreuther observed the weapon being thrown away from Thomas and heard the weapon land out of Thomas's reach on a parked car. Both Thomas and Wellenreuther testified that after disposing of his weapon (which turned out to be a BB gun) Thomas ran away from Wellenreuther.

19. The Court does not credit Wellenreuther's testimony that he identified himself as a police officer just prior to the Second Gunshot being fired. However, even if Wellenreuther did so identify himself, that would not change this Court's legal conclusion that the use of deadly force in the form of the Second Gunshot was unconstitutional. This is because it is clear that a reasonable police officer would have known, to a certainty, that Thomas was unarmed. Such a reasonable police officer would also know that while Thomas may have threatened violence at the convenience store, no violence had occurred.

20. No reasonable police officer could have objectively believed that Thomas was in possession of a weapon when the Second Gunshot was fired.

21. At the time of the Second Gunshot, there was not any objective reason to believe that deadly force was necessary to protect Wellenreuther or any other member of the public.

II.   Qualified Immunity

22. Qualified immunity is an affirmative defense that must be pled and proven by defendant. Spavone v. New York City Dep't. of Correctional Services, 719 F.3d 127, 134 (2d Cir. 2013).

23. While Defendant pled qualified immunity in the answer to the first complaint, that defense was in no other way litigated. Thus, over eight years of litigation, the qualified immunity defense was neither raised by way of motion, nor during any pretrial proceedings.

Indeed, the defense was not even referred to in the pretrial order or in the proposed jury instructions when this case was initially scheduled to be tried by a jury. Instead, qualified immunity was not briefed by Defendant until submission of his post-trial briefing. Under these circumstances the Court has no difficulty concluding that Wellenreuther has waived the right to argue that his actions were protected by qualified immunity. See Blissett v. Coughlin, 66 F.3d 531, 538-39 (2d Cir. 1995) (qualified immunity defense waived where defendant failed, over the five year course of proceedings to "adequately develop" the defense or move for summary judgment, but instead raised the defense for the first time at and, only after prompting by the trial court).

24. Even assuming that Defendant has not waived the qualified immunity defense, it does not, under the facts herein, apply.

25. Qualified immunity protects a defendant from liability when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." White v. Pauly, 137 S. Ct. 548, 551, 196 L. Ed. 2d 463 (2017) (quoting Mullenix v. Luna, 577 U.S. 7, 11, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015)). It applies "regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Spavone, 719 F.3d at 135 (quoting Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) (internal quotation marks omitted)).

26. The standard to be applied is an objective one, "asking not whether the defendant officer acted in good faith or what he himself knew or believed, but rather what would have been known to or believed by a reasonable officer in the defendant's position." Outlaw v. City of Hartford, 884 F.3d 351, 367 (2d Cir. 2018).

27. So long as the officer "has an objectively reasonable belief that his actions are lawful," he "is entitled to qualified immunity." <u>Swartz v. Insogna</u>, 704 F.3d 105, 109 (2d Cir. 2013) (internal quotation marks omitted).

28. Whether a right was clearly established is a question of law, and whether a defendant's conduct was objectively reasonable, that is, whether a reasonable officer would have reasonably believed that his conduct did not violate a clearly established right, is a mixed question of law and fact. <u>Kerman v. City of New York</u>, 374 F.3d 93, 108-09 (2d Cir. 2004).

29. As the legal discussion above makes clear, the constitutional right to be free from the use of excessive force under the facts here was well established. Specifically, the use of deadly force against a fleeing suspect, where there could be no objective belief that either the officer or public was in danger, violates the Firth Amendment. <u>See</u> <u>Garner</u>, 471 U.S. at 11.

30. Under the facts here, again, as stated above, Wellenreuther could not have objectively believed that the use of deadly force in the form of the Second Gunshot was Constitutional. Thus, even if the defense of qualified immunity was not waived, it has no application here and does not change this Court's conclusion that Wellenreuther violated Thomas's Fourth Amendment rights when firing the Second Gunshot.

III. <u>Damages</u>

31. Having determined that Defendant is liable for injuries sustained as a result of the use of excessive force the Court must decide the proper amount to award Plaintiff as damages. Plaintiff does not seek a particular amount but notes with authority, that damage awards

in similar excessive force cases are frequently in the hundreds of thousands of dollars. Indeed, jury awards exceeding one million dollars have been sustained. While Defendant does not concede liability, he argues that Plaintiff has suffered only "garden variety" emotional damages and any award should be limited, at most, to $35,000.

32. At the outset the Court rejects Defendant's "garden variety" analysis. The cases relied upon by Defendant are inapposite employment discrimination cases where plaintiffs seek compensation for emotional injury without evidence of having received medical care. The Court agrees that Thomas did not offer expert medical witness testimony as to treatment for mental trauma, and the Court will consider only the value of his testimony when assessing damages. More importantly, however, while Plaintiff seeks damages for emotional trauma, he mostly seeks damages for injuries sustained as a result of a gunshot wound to the back of his neck – hardly the type of garden variety harm sustained in the employment cases relied upon by Defendant. The Court therefore turns to consider what damages are appropriate to award based upon Plaintiff's testimony and the uncontroverted evidence regarding the gunshot wound and his hospitalization. The Court also credits Thomas's testimony as to how he felt following the shooting.

33. While it is difficult to put a dollar value on damages suffered as a result of the use of force, the Court must arrive at a damage award to properly compensate Plaintiff for his injuries. When considering the amount to award, it is appropriate to consider other cases that have awarded damages for the use of excessive force and ensuing mental trauma. While each case presents its own unique set of circumstances, and no one case is binding, amounts awarded in other cases provide helpful information to assist the Court in making its award here.

34. It is also appropriate to consider the value of prior awards in today's dollar value. Plaintiff suggests, and this Court agrees, that reference to the United States Bureau of Labor Statistics Consumer Price Index ("CPI") inflation calculator is helpful. That calculator compares the "buying power" of money at a prior date in time to the present power of money. Thus, for example, the CPI calculator tells us that a $25,000 award made in 1985 has the same buying power as approximately $63,000 today. This calculator is available at https://www.bls.gov/data/inflation_calculator.htm. When assessing the precedential value of older cases, the Court will consider the buying power of the awards in those cases to the buying power of those amounts today.

35. It is not surprising to find that compensatory damages awards for excessive force claims in this Circuit vary. It is useful for this Court to consider awards made in "other comparable cases." DiSorbo v. Hoy, 343 F.3d 172 (2d Cir. 2003). The Court is mindful to consider what the evidence showed as to the physical and emotional trauma at the time of the injury, as well as any injury that could continue to be suffered in the future. See Morales v. City of N.Y., No. 99 Civ. 10004, 2001 WL 8594, *10 (S.D.N.Y. Jan. 2, 2001)(remitting $2.75 compensatory damages award to $50,000 when plaintiff only suffered from bruises which healed, required no serious medical treatment, and sustained no permanent physical injury, although her "emotional suffering was much greater") (citing Blisset v. Coughlin, 66 F.3d 531 (2d Cir. 1995); Rodick v. City of Schenectady, 1 F.3d 1341 (2d Cir. 1993) (awarding $150,000 in compensatory damages where plaintiff was repeatedly beaten by defendants while arresting him in his home and fell down a flight of stairs during the struggle); Fiacco v. City of Rensselaer, 783 F.2d 319 (2d Cir. 1986) (remitting

compensatory damages award of $75,000 to $25,000 where the injuries sustained included handcuffs that were embedded in plaintiff's wrists, plaintiff's hands being blue, plaintiff requiring surgery to repair a tendon in her finger, and plaintiff's arm placed in brace from the wrist down); Wheatly v. Ford, 679 F.2d 1037 (2d Cir. 1982) (reducing compensatory damages award from $55,000 to $25,000 because any lasting injury to plaintiff was "very minor" and that "while perhaps severe, [the plaintiff's] temporary discomfort did not last for long," where plaintiff was struck with a "slapjack" during his arrest, had his bare feet stomped on and was cuffed in the ears); DiSorbo, 343 F.3d at 185-86 (reducing compensatory damages award from $400,000 to $250,000 where the injuries included two large hematomas and bruises all over her body and did not require surgery or result in permanent scarring or nerve damage, and sustained psychological injuries caused by the "highly traumatic nature" of the attack); Alla v. Verkay, 979 F. Supp. 2d 349, 363-65, 377 (E.D.N.Y. 2013) (upholding an award of $250,000 in non-economic compensatory damages where the plaintiff sustained a fractured facial bone which caused chronic headaches, limited jaw function, recurring nightmares, and emotional injuries); Bender v. City of N.Y., 78 F.3d 787, 792-95 (2d Cir. 1996) (remitting award of $300,000 to $150,000 where the plaintiff did not sustain a permanent physical injury but suffered nightmares and loss of sleep for more than a year, mostly resulting from being wrongfully confined for one day); King v. City of N.Y., No. 92 Civ. 7738, 1996 WL 737195, at *4, 6 (S.D.N.Y. Dec. 24, 1996) (remitting compensatory damage award to $200,000 where the plaintiff suffered no permanent injuries but received bruises, black eyes, abrasions, a gash in his head, and other blunt trauma); Rosas v. Balter Sales Co. Inc., 2018 WL 3199253, at *9-10 (S.D.N.Y. June 29, 2018) (reducing compensatory damages award

to $180,000 for "garden variety" emotional distress). <u>Tranchina v. McGrath</u>, 2021 WL 1599189, at *6 (N.D.N.Y. April 23, 2021) (upholding an award of $190,000 where the plaintiff sustained a fractured rib along with other physical injuries although none of which caused long-term physical suffering or a lasting impairment as well as psychological injuries such as continuing difficulty sleeping and recurring thoughts about the incident).

36. The conscious pain and suffering award recently made in the case of <u>Collado v. City of New York</u>, 396 F. Supp. 3d 265 (S.D.N.Y 2019) is instructive. There, Circuit Judge Chin, sitting by designation, agreed that a $300,000 award for conscious pain and suffering following a gunshot wound was reasonable. <u>Collado</u>, 396 F. Supp. 3d at 277. While the victim in Collado ultimately succumbed to his wounds (resulting in an additional award of $2.5 million) Judge Chin upheld the $300,000 award as proper compensation for the 50 minutes of conscious pain suffered by the victim prior to his death. <u>Id.</u>

37. In <u>King v. City of N.Y.</u>, No. 92 Civ. 7738, 1996 WL 737195 (S.D.N.Y. Dec. 24, 1996), the court directed that plaintiff accept a remitted award in the amount of $200,000. There, a jury awarded $300,000 as damages in a case where the plaintiff was subjected to excessive force in the form of a being kicked, hit with a walkie-talkie, and having his head forced back by a nightstick. While plaintiff was treated at a hospital for blunt force trauma, he was released without an overnight stay. As to continuing damages, plaintiff in <u>King</u> suffered ongoing psychological damages in the way of a fear of police and going outside with friends. Distinguishing <u>King</u> from the case here, plaintiff there was subject to malicious prosecution and an unwarranted 30 hours of incarceration. <u>Id.</u> at *4-5. Using

the CPI calculator referred to above, the $200,000 in damages award in <u>King</u> in 1996, is equivalent to approximately $342,000 in today's dollars.

38. Decided in a time frame similar to <u>King</u>, the Second Circuit upheld a jury award of $75,000 (equivalent to approximately $132,000 in 2021 dollars) in <u>Blissettt v. Coughlin</u>, 66 F.3d 531 (2d Cir. 1995). There, plaintiff suffered injuries following the use of excessive force involving the beating of plaintiff by defendant prison guards with their hands and a baton.

39. A significantly higher jury award of $650,000 in compensatory damages was reinstated (after reversal of a district court's remittitur) in <u>Ismail v. Cohen</u>, 899 F.2d 184 (2d Cir. 1990). In <u>Ismail</u>, the plaintiff suffered excessive force in the form of being struck on the back of his head after which he suffered a brief loss of consciousness. Additionally, Plaintiff suffered displaced vertebrae, a cracked rib and head trauma following a beating that included defendant's knee being placed on plaintiff's back. Following the incident, the plaintiff in <u>Ismail</u> continued to suffer from chronic pain. <u>Ismail</u>, 899 F.2d at 186. The $650,000 award made in 1990 is equivalent to $1.35 million in today's dollars.

40. "Emotional distress awards within the Second Circuit can generally be grouped into three categories of claims: garden-variety, significant and egregious. In garden variety emotional distress claims, the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury. Such claims typically lack extraordinary circumstances and are not supported by any medical corroboration." <u>Mugavero v. Arms Acres, Inc.</u>, 680 F. Supp. 2d 544, 578 (S.D.N.Y. 2010) (internal citations omitted). Garden variety emotional distress claims "generally merit $30,000 to $125,000

awards." Id. "Significant emotional distress claims differ from the garden-variety claims in that they are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses." Id. (internal quotation marks omitted). Significant emotional distress claims generally merit awards at least as high as $175,000. See, e.g., id. (upholding total emotional distress award of $175,000 where plaintiff offered evidence of "more than a garden variety claim"). "Finally, 'egregious' emotional distress claims generally involve either 'outrageous or shocking' discriminatory conduct or a significant impact on the physical health of the plaintiff." Id. (internal quotation marks omitted). Substantially higher awards are appropriate for that type of claim. See, e.g., Ramirez v. N.Y.C. Off-Track Betting Corp., 112 F.3d 38, 43 (2d Cir. 1997) (affirming a $500,000 award, reduced from $1,145,625 by the district court, in employment discrimination case).

41. An award to compensate for emotional damages may be appropriate even if the plaintiff failed to present expert medical testimony on damages. Tranchina, 2021 WL 1599189 at *6 (upholding compensatory damages award for emotional damages where only testimony in support of emotional damages was plaintiff's); Hughes v. Patrolmen's Benev. Ass'n of City of New York, Inc., 850 F.2d 876 (2d Cir. 1988) (upholding $225,000 compensatory damages award for emotional damages even though no permanent harm resulted).

42. In Tranchina, plaintiff testified about the altercation with the defendant and explained that he feared for his life, believed he was going to die and had since experienced difficulty sleeping and had recurring thoughts about the incident. 2021 WL 1599189 at

*6. The Court found that plaintiff's testimony regarding his emotional injuries along with the evidence of the nature of the altercation and the photographs were sufficient for the jury to award emotional damages. Id.

43. Here, there is no doubt as to Thomas's pain on the date of the shooting and during his hospitalization. The pain of being shot in the neck is impossible for others to imagine, but is likely similar to the pain suffered by the deceased in Collado prior to his death. The $300,000 award for conscious pain and suffering presents an appropriate comparator for a damages award. Thomas was indeed fortunate to have survived the Second Gunshot. He is further fortunate to appear to have made a full physical recovery. While the Court credits Thomas's testimony that his hemophilia treatment regimen was complicated during his hospital stay, the Court was not presented with evidence upon which to base a continuing physical damages award based upon the argument that his long term hemophilia treatment differs. However, based upon the pain and suffering following the Second Gunshot, as well as pain and suffering during his near week-long hospitalization and intense hemophilia treatment, the Court finds that Thomas should be compensated in the amount of $400,000. As to Thomas's mental state following the shooting, the Court is again hampered by the lack of an expert medical opinion. However, the Court credits Thomas's testimony regarding the depression suffered as a result of the shooting, as well as the fact that he was treated with medication. The Court therefore will award Thomas damages in the amount of $75,000 to reflect mental damages suffered as a result of the shooting.

44. In conclusion and upon consideration of the facts before the Court and the findings and conclusions herein he Court holds that awards Thomas $475,000.

## CONCLUSION

For the foregoing reasons the Court holds that Defendant violated Thomas's Fourth Amendment right to be free from the use of deadly force when he shot the Second Gunshot at Thomas. Thomas is hereby awarded the amount of $475,000 as compensation for his physical and mental pain and suffering. The Clerk of the Court is directed to enter judgment accordingly and to thereafter close the file in this case.

SO ORDERED

Dated: Central Islip, New York
May 21, 2021

 /s/ Anne Y. Shields
Anne Y. Shields
United States Magistrate Judge